IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| CHRISTOPHER YOUNG, | : | CIVIL NO. 1:18-CV-879 |
| | : | |
| Plaintiff | : | (Chief Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| TAMMY FERGUSON, *et al.*, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Plaintiff Christopher Young ("Young"), an inmate who was housed at all relevant times at the State Correctional Institution, Benner Township, Pennsylvania ("SCI-Benner"), commenced this action pursuant to 42 U.S.C. § 1983. (Doc. 1). Named as defendants are Tammy Ferguson, Daniel Myers, Bobbi Jo Salamon, Jennifer Rossman, Stefan Stessney, David Link, Timothy Graham, John Doe/Danison, W. Matthews, Joseph Dupont, and John Wetzel. (Id.) Pending before the court is Young's motion (Doc. 26) for summary judgment, and a cross-motion (Doc. 33) for summary judgment filed by defendants Ferguson, Myers, Salamon, Rossman, Stessney, and Link. For the reasons set forth below, the court will deny Young's motion and grant defendants' motion.

## I.   Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of

proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

"The rule is no different where there are cross-motions for summary judgment." Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008). Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968). Thus, "when presented with cross[-]motions for summary judgment, the Court must consider the motions separately, and view the evidence presented for each motion in the light most favorable to the nonmoving party." Borrell v. Bloomsburg Univ., 63 F. Supp. 3d 418, 433 (M.D. Pa. 2014) (citations omitted).

2

"[E]ach movant must demonstrate that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny [both] motions." Quarles v. Palakovich, 736 F. Supp. 2d 941, 946 (M.D. Pa. 2010) (citing Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1023 (3d Cir. 2008)).

## II.    Statement of Material Facts

On five separate occasions, Young was temporarily transferred to SCI-Benner for court appearances. (Doc. 1 ¶¶ 16, 30, 35-36, 43). While he was temporarily held, he was placed in the Restricted Housing Unit ("RHU") under Administrative Custody ("AC") status and was not released to general population. (Id.; Doc. 29 ¶ 1). Young asserts that his placement in the RHU during his temporary stays violated his Eighth and Fourteenth Amendment rights. (Doc. 1 ¶ 1).

Young was first transferred to SCI-Benner on March 10, 2016 and was placed on AC status pursuant to DC-ADM 802 § 1(B)(1)(h). (Doc. 29 ¶ 1; Doc. 35 ¶¶ 1, 17; Doc. 47 ¶ 17; Doc. 1, Ex. A). It was noted that Young was placed on AC status because he was being held temporarily for another authority and was not classified for general population of the holding facility. (Id.) Young remained at SCI-Benner until April 14, 2016. (Doc. 35 ¶ 17; Doc. 47 ¶ 17). This first visit totaled thirty-five days. (Id.)

Young's second transfer to SCI-Benner occurred on May 5, 2016. On that date, Young was placed on AC status pursuant to DC-ADM 802 § 1(B)(1)(h), because he was being held temporarily for another authority and was not classified for

general population of the holding facility.  (Doc. 29 ¶ 2; Doc. 35 ¶ 2; Doc. 1, Ex. R).

The reason for Young's placement on AC status at SCI-Benner was updated on May

26, 2016.  (Doc. 29 ¶ 1; Doc. 35 ¶ 1; Doc. 1, Ex. V).  The facility cited to DC-ADM 802 §

1(B)(1)(k) and stated that Young was being placed on AC status due to lack of bed

space in the facility.  (Id.)  Young remained at SCI-Benner until May 26, 2016.  (Doc.

35 ¶ 20; Doc. 47 ¶ 20).  This second visit totaled twenty-two days.  (Id.)

Young's third transfer to SCI-Benner occurred on July 14, 2016.  (Doc. 29 ¶ 1;

Doc. 35 ¶ 1; Doc. 1 ¶ 35).  On that date, Young was placed on AC status pursuant to

DC-ADM 802 § 1(B)(1)(h), because he was being held temporarily for another

authority and was not classified for general population of the holding facility.  (Id.)

Young remained at SCI-Benner until August 25, 2016.  (Doc. 35 ¶ 21; Doc. 47 ¶ 21).

The third visit totaled forty-three days.  (Id.)

On September 20, 2016, Young was transferred to SCI-Benner for a fourth

time and was placed on AC status pursuant to DC-ADM 802 § 1(B)(1)(h).  (Doc. 29 ¶

1; Doc. 35 ¶ 1; Doc. 1, Ex. Y).  It was again noted that Young was being held

temporarily for another authority and was not classified for general population of

the holding facility.  (Id.)  On September 28, 2016, the reason for Young's placement

on AC status was updated.  (Doc. 29 ¶ 1; Doc. 35 ¶ 1; Doc. 1, Ex. 1).  The facility cited

to DC-ADM 802 § 1(B)(1)(k) and stated that Young was being placed on AC status

due to lack of appropriate bed space.  (Id.)  Young remained at SCI-Benner until

October 11, 2016, for a total of twenty-one days.  (Doc. 35 ¶ 22; Doc. 47 ¶ 22).

On November 15, 2016, Young was transferred to SCI-Benner for a fifth time and was placed on AC status pursuant to DC-ADM 802 § 1(B)(1)(k). (Doc. 29 ¶ 1; Doc. 35 ¶ 1; Doc. 1, Ex. 7). The facility noted that Young was temporarily assigned to AC status due to the operational needs of the facility, such as lack of appropriate bed space. (Id.) Young remained at SCI-Benner until November 22, 2016, for a total of seven days. (Doc. 35 ¶ 23; Doc. 47 ¶ 23).

During Young's first visit to SCI-Benner, he complained to the Program Review Committee ("PRC") about his placement in the RHU. (Doc. 29 ¶ 2; Doc. 35 ¶ 2; Doc. 1 ¶¶ 18-27). Young appealed the PRC decision to the Office of the Chief Hearing Examiner in accordance with DC-ADM 802. (Id.) Defendants assert that the only individuals involved with Young during his first visit were the members of the PRC, Salamon, Rossman, and Link, as well as Superintendent Ferguson. (Doc. 35 ¶ 18). Defendant Stessney had no involvement with Young during his first visit. (Id.; Doc. 34-1, at 58, Deposition of Christopher Young ("Young Dep."), at 57:12-58:1). The parties dispute whether defendant Myers had any involvement with Young during this first visit. (Doc. 35 ¶ 18; Doc. 47 ¶ 18).

During Young's second and third transfers to SCI-Benner, he did not appeal or administratively exhaust his placements in the RHU. (Doc. 29 ¶ 2; Doc. 35 ¶ 2; Doc. 34-1, at 60, Young Dep. at 59:23-25).

During his fourth and fifth visits to SCI-Benner, Young complained to the PRC about his placement in the RHU. (Doc. 29 ¶ 2; Doc. 35 ¶ 2; Doc. 1 ¶¶ 36-47).

5

Young appealed the PRC decision to the Office of the Chief Hearing Examiner in accordance with DC-ADM 802. (Id.)

It was the standard practice at SCI-Benner to place all inmates who arrived as temporary transfers for court into the RHU on AC status. (Doc. 29 ¶ 3; Doc. 35 ¶ 3; Doc. 30, Ex. E-2 ¶ 4). The parties agree that Young was eligible for release to general population. (Doc. 29 ¶ 2; Doc. 35 ¶ 2; Doc. 30, Ex. F-9). Defendants deny that they refused to release Young to general population. (Doc. 35 ¶ 3). Every day, unit managers coordinate with the Corrections Classification Program Manager to fill beds that become available in general population. (Doc. 35 ¶¶ 3, 28; Doc. 30, Exs. D-2 and E-3 ¶ 13; Doc. 47 ¶ 28). During Young's transfers to SCI-Benner, no beds became available that could accommodate him based on his status codes. (Doc. 35 ¶¶ 3, 28; Doc. 30, Exs. D-2, E-3 ¶ 13).

A general population inmate may be assigned AC status and placed in the RHU for several reasons, including: (i) the inmate is being held temporarily for another authority and is not classified for the general population of the holding facility; however, a parole violator and temporary transfers from another facility are eligible for release to general population; or, (ii) the inmate has completed a disciplinary custody sanction but other reasons exist, or the facility has an operational need, e.g., appropriate bed space, to temporarily assign the inmate to AC status. (Doc. 35 ¶ 4; Doc. 30, Ex. F, Procedures Manual §§ 1(B)(1)(h), (k)).

Young was "eligible" for placement in general population during his limited stays at SCI-Benner. (Doc. 29 ¶¶ 6, 14; Doc. 35 ¶¶ 6, 14). Defendants deny that

6

Young was "classified" for general population. (Doc. 35 ¶ 6; Doc. 30, Ex. F, Procedures Manual § 1(B)(1)(h)). Defendants further deny that Young was "entitled" to be released to general population. (Doc. 29 ¶ 14; Doc. 35 ¶ 14).

Pursuant to DC-ADM 802, the Department of Corrections ("DOC") places an inmate on AC status when their presence in general population would constitute a threat to life, property, himself/herself, staff, other inmates, the public, or the secure or orderly running of the facility. (Doc. 29 ¶ 7; Doc. 35 ¶ 7). The parties agree that Young did not constitute a threat to life, property, himself/herself, staff, other inmates, or the public. (Doc. 29 ¶ 11; Doc. 35 ¶ 11). The parties dispute whether Young constituted a threat to the secure or orderly running of the facility. (Doc. 35 ¶ 11).

DC-ADM 802 does not mandate temporary transfers for court to be placed in AC status; however, DC-ADM 802 §1(B) permits placement into AC status for temporary transfers. (Doc. 29 ¶ 12; Doc. 35 ¶ 12; Doc. 30, Ex. F, Procedures Manual § 1(B)(1)(h)).

The office of population management made the determination to temporarily transfer Young under his appropriate security level to SCI-Benner. (Doc. 29 ¶ 13; Doc. 35 ¶ 13). Defendants contend that Young was transferred to a facility with an appropriate security level to house him. (Doc. 35 ¶ 16). Defendants further assert that DC-ADM 802 permitted them to place Young on AC status and house him in the RHU pending appropriate bed space in general population. (Doc. 35 ¶ 16). At all relevant times, Young was classified with a Z code (requiring a single cell) and

7

an H code (for assaultive behavior) status.  (Doc. 35 ¶¶ 16, 25; Doc. 30, Ex. E-3 ¶ 12; Doc. 47 ¶ 25).

While at SCI-Benner, defendants aver that Young had a bed, food on a daily basis, hot and cold water available in the cell, a functioning toilet, he received medical treatment when needed, and was given opportunities to exercise and shower.  (Doc. 35 ¶ 24; Doc. 34-1, Young Dep. at 24:1-9, 24:11-13, 25:12-15, 27:14-16, 27:17-25, 28:13-15).  Young contends that he did not have a bed on one occasion, he was rushed to eat, he was occasionally placed in a dirty cell, and he received ineffective medical care for certain ailments.  (Doc. 47 ¶ 24).

There were 2,076 beds available at SCI-Benner in general population.  (Doc. 35 ¶ 26; Doc. 30, Ex. I-2; Doc. 47 ¶ 26).  This included 252 beds which were reserved for Special Needs and Residential Treatment Unit inmates only, 60 beds only for Custody Level 2 inmates, 4 psychiatric observation cells, and 19 infirmary beds.  (Doc. 35 ¶ 26; Doc. 30, Ex. I-2; Doc. 47 ¶ 26).  Defendants contend that SCI-Benner was near capacity and, at times, there was a waiting list of up to 30 inmates waiting for beds in general population.  (Doc. 35 ¶ 27; Doc. 30, Ex. D-2).

DC-ADM 802 is applicable to all facilities under the supervision of the DOC.  (Doc. 29 ¶ 8; Doc. 35 ¶ 8).  During Young's trips to SCI-Benner, no provision of DC-ADM 802 was suspended.  (Doc. 29 ¶ 9; Doc. 35 ¶ 9).  DC-ADM 802 supersedes facility policies and procedures.  (Doc. 29 ¶ 10; Doc. 35 ¶ 10).

DC-ADM 802 was updated effective November 14, 2016 to permit a facility to place an inmate directly into general population, pending bed space, unless

identified factors exist.  (Doc. 29 ¶ 15; Doc. 35 ¶ 15).  Defendants deny that the

update prohibits a temporary transfer from being placed in the RHU on AC status.

(Doc. 35 ¶ 15).

## III.  <u>Discussion</u>

### A.  **Mental and Emotional Injury**

Defendants argue that Young's request for monetary relief to the extent that

it seeks compensatory damages is barred by Section 1997e(e).  (Doc. 34, at 13).

42 U.S.C. § 1997e(e) provides that "[n]o federal civil action may be brought by

a prisoner confined in a jail, prison or other correctional facility, for mental or

emotional injury suffered while in custody without a prior showing of physical

injury."  In <u>Allah v. Al-Hafeez</u>, 226 F.3d 247, 250 (3d Cir. 2000), the United States

Court of Appeals for the Third Circuit recognized that where a plaintiff fails to

allege actual injury, section 1997e(e) bars recovery of compensatory damages.

However, the Court added that an inmate alleging a violation of his constitutional

rights may still pursue the action to recover nominal and/or punitive damages even

in the absence of compensable harm.  <u>See id.</u>

Young's civil rights claims assert violations of his constitutional rights and

seek both compensatory and punitive damages.  (<u>See</u> Doc. 1, at 4, 18).  Under the

standards announced in <u>Allah</u> and section 1997e(e), Young's request for monetary

relief to the extent that it seeks compensatory damages for mental and emotional

injuries is barred; however, the court will examine Young's claims to the extent they

seek noncompensatory damages.

**B.     Exhaustion of Administrative Review**

Defendants argue that Young failed to properly exhaust two of his

placements in the RHU as required by the Prison Litigation Reform Act of 1996 (the

"PLRA") before initiating this lawsuit.  (Doc. 34, at 11-12).  The PLRA requires a

prisoner to pursue all avenues of relief available within the prison's grievance

system before bringing a federal civil rights action concerning prison conditions.

See 42 U.S.C. § 1997e(a); Booth v. Churner, 206 F.3d 289, 291 (3d Cir. 2000).  Section

1997e(a) establishes the requirement of administrative exhaustion:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The PLRA "exhaustion requirement applies to all inmate suits about prison

life, whether they involve general circumstances or particular episodes, and

whether they allege excessive force or some other wrong." Porter v. Nussle, 534

U.S. 516, 532 (2002).  It has been made clear that the exhaustion requirement is

mandatory.  See Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth

v. Churner, 532 U.S. 731, 741 (2001) (holding that the exhaustion requirement of

the PLRA applies to grievance procedures "regardless of the relief offered through

administrative procedures"); Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000) (same).

"[I]t is beyond the power of [any] court . . . to excuse compliance with the

exhaustion requirement." Nyhuis, 204 F.3d at 73 (quoting Beeson v. Fishkill Corr.

Facility, 28 F. Supp.2d 884, 894-95 (S.D.N.Y. 1998)).

To exhaust administrative remedies an inmate must comply with all applicable grievance procedures and rules. See Spruill v. Gillis, 372 F.3d 218, 231 (3d Cir. 2004). The PLRA requires not only technical exhaustion of administrative remedies, but also substantial compliance with procedural requirements. Id. at 227-32; see also Nyhuis, 204 F.3d at 77-78. A procedural default by the prisoner, either through late or improper filings, bars the prisoner from bringing a claim in federal court unless equitable considerations warrant review of the claim. Spruill, 372 F.3d at 227-32; see also Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). Finally, whether an inmate has properly exhausted administrative remedies is a question of law that is to be determined by the court, even if that determination requires the resolution of disputed facts. See Small v. Camden County, 728 F.3d 265, 268 (3d Cir. 2013); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010).[1]

The Department of Corrections has an Inmate Grievance System, set forth in DC-ADM 804, which permits any inmate to seek review of problems that may arise during the course of confinement. See 37 PA. CODE § 93.9(a); PA. DEP'T OF CORR., No. DC-ADM 804. After an attempt to resolve any problems informally, an inmate may submit a written grievance to the Facility's Grievance Coordinator for initial review. This must occur within fifteen days after the events upon which the claims

---

[1] In accordance with Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018), the court placed the parties on notice that it would consider exhaustion in its role as fact finder and afforded the parties the opportunity to be heard under Small, 728 F.3d at 268. (Doc. 39).

are based.  Within fifteen days of an adverse decision by the Grievance Coordinator,

an inmate may then appeal to the Facility Manager of the institution.  Thereafter,

within fifteen days of an adverse decision by the Facility Manager, an inmate may

file a final appeal to the Secretary's Office of Inmate Grievances and Appeals.  An

appeal to final review cannot be completed unless an inmate complies with all

established procedures.  An inmate must exhaust all three levels of review and

comply with all procedural requirements of the grievance review process in order to

fully exhaust an issue.  See Booth, 206 F.3d at 293 n. 2 (outlining Pennsylvania's

grievance review process); Ingram v. SCI Camp Hill, 448 F. App'x 275, 279 (3d Cir.

2011) (same).

The undisputed evidence demonstrates that Young failed to appeal or

administratively exhaust his second and third placements in the RHU at SCI-

Benner.  Young concedes that he did not fully exhaust all of his placements in the

RHU, but appealed "most" of his placements in administrative segregation.  (Doc.

29 ¶ 2).  Rather than provide any evidence that he properly exhausted the

administrative remedies regarding his second and third placements in the RHU,

Young argues that he was not required to exhaust each complaint.  (Doc. 46, at 5-8).

The PLRA mandates that inmates properly exhaust their administrative

remedies before filing suit in federal court, a requirement which demands

compliance with an agency's deadlines and procedural rules.  Woodford v. Ngo, 548

U.S. 81, 90-93 (2006).  It is well-settled that administrative remedies must be

exhausted prior to the initiation of suit.  See Oriakhi v. United States, 165 F. App'x

991, 993 (3d Cir. 2006) ("[A] prisoner must exhaust all available administrative remedies prior to filing suit."). Young did not do so with respect to his second and third placements in the RHU at SCI-Benner.

Under certain circumstances, administrative remedies may not be effectively available to an inmate, preventing a timely pursuit of the prison grievance process. See, e.g., Camp, 219 F.3d at 281; Robinson v. Superintendent Rockview SCI, 831 F.3d 148, 154 (3d Cir. 2016) (holding that prison officials rendered plaintiff's administrative remedies unavailable when they failed to timely respond to his grievance and ignored his follow-up requests for a decision). The record simply does not support a finding that the administrative process was unavailable to Young. To the contrary, it establishes that Young had ready access to the administrative remedy process and properly exhausted the claims with respect to his first, fourth, and fifth temporary transfers to SCI-Benner. It is clear that Young failed to exhaust administrative remedies regarding his second and third placements in the RHU before initiating the instant action. Moreover, Young has not demonstrated that his failure to fully pursue such administrative relief should be excused.

Young's claims regarding his second and third placements in the RHU at SCI-Benner are barred on administrative exhaustion grounds, and defendants are entitled to summary judgment on these claims. The court will examine Young's claims with respect to his first, fourth, and fifth temporary transfers to SCI-Benner.

**B.      Eighth Amendment Claim**

Young argues that his placement in the RHU constituted cruel and unusual punishment in violation of his Eighth Amendment rights.  In order to state an Eighth Amendment claim, a plaintiff must establish both that he has been denied "the minimal civilized measure of life's necessities" and that defendants had a "sufficiently culpable state of mind."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).  To violate the Eighth Amendment's prohibition of cruel and unusual punishment, conditions cited by an inmate must be "objectively, sufficiently serious [and] must result in the denial of the minimal civilized measure of life's necessities."  <u>Id.</u> at 834 (internal citation and quotation omitted).  Only "extreme deprivations" are sufficient to make out a conditions of confinement claim.  <u>Hudson v. McMillen</u>, 503 U.S. 1, 8-9 (1992).  A plaintiff must prove that the deprivation is sufficiently serious when viewed within the context of "contemporary standards of decency."  <u>Helling v. McKinney</u>, 509 U.S. 25, 36 (1993).  Although a combination of confinement conditions—considered alone constitutionally insufficient—may present an Eighth Amendment violation, they nevertheless must cumulatively produce "the deprivation of a single, identifiable human need such as food, warmth, or exercise." <u>Wilson v. Seiter</u>, 501 U.S. 294, 304 (1991); <u>see</u> <u>also</u> <u>Griffin v. Vaughn</u>, 112 F.3d 703, 709 (3d Cir. 1997) (identifying the denial of basic human needs as "food, clothing, shelter, sanitation, medical care and personal safety").

14

In applying this test, the Supreme Court acknowledges that the Eighth Amendment does not mandate that prisons be free of discomfort. Hudson, 503 U.S. at 9. Placement in administrative segregation, alone, is insufficient to constitute cruel and unusual punishment. See Gibson v. Lynch, 652 F.2d 348, 352 (3d Cir. 1981), cert. denied, 462 U.S. 1137 (1983) ("administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment"). In assessing whether an inmate's placement in segregation violates the Eighth Amendment, courts must look to the "duration and conditions of segregated confinement" and the "touchstone is the health of the inmate." Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992), *superseded on other grounds by statute*, Prison Litigation Reform Act, 42 U.S.C. § 1997, *et seq.*).

Young has not presented any evidence that he was deprived any basic human needs during his temporary transfers to SCI-Benner. During his three temporary transfers to SCI-Benner, Young was placed in the RHU for a total of sixty-three days. Young admitted that an RHU cell is basically the same as a general population cell in that they are the same size, contain a toilet, sink, and one or two beds. (Doc. 34-1, Young Dep. at 20:14-19 and 22:4-16). Young also admitted that he was provided a bed, food on a daily basis, had hot and cold water available in the cell, had a functioning toilet, received medical treatment, and was able to exercise and shower. (Doc. 34-1, Young Dep. at 24:1-9, 24:11-13, 25:12-15, 27:14-16, 27:17-25, and 28:13-15). Young asserts that on one occasion he was placed in a cell without a bed and had to wait for a bed, he was rushed to eat, he was occasionally placed in a

15

dirty cell and was not able to clean for a few days, and he received ineffective medical care for certain ailments. (Doc. 24-1, Young Dep. at 23:23-24:6; Doc. 47 ¶ 24). Young has not presented any evidence that he was deprived of "the minimal civilized measure of life's necessities." Wilson, 501 U.S. at 298; see also Adderly v. Ferrier, 419 F. App'x 135, 140 (3d Cir. 2011) (holding that denial of access to clothing, toiletries, legal mail, a pillow, a mattress, and showers for seven days did not "constitute a denial of the 'minimal civilized measures of life's necessities'") (quoting Williams v. Delo, 49 F.3d 442, 444-47 (8th Cir. 1995)). As stated, Young was undisputedly provided a bed, food, hot and cold water, a toilet, medical care, and the opportunity to exercise and shower. The court finds that Young has failed to establish an Eighth Amendment claim related to his conditions of confinement in the RHU at SCI-Benner.

Additionally, Young has failed to establish that any of the defendants acted with deliberate indifference. The record reflects that unit managers coordinated on a daily basis with the Corrections Classification Program Manager to fill beds that became available in general population. (Doc. 35 ¶¶ 3, 28; Doc. 30, Exs. D-2 and E-3 ¶ 13; Doc. 47 ¶ 28). It is undisputed that Young was *eligible* for release to general population as a temporary transfer to SCI-Benner. However, DC-ADM 802 did not *guarantee* him placement in general population. The record reflects that Young was classified as a Z code and H code inmate, which required him to be placed in a single cell and indicated that he had assaultive behavior. (See Doc. 30, Ex. E ¶ 12). Based on these program codes, the lack of appropriate bed space in general

16

population to accommodate Young's program codes, and the fact that he was a temporary transfer at SCI-Benner, he was placed in the RHU on AC status. (Id. at ¶ 13). Because Young failed to establish that defendants acted with deliberate indifference by placing him in the RHU during his temporary transfers to SCI-Benner, in accordance with DOC policy, the court will grant summary judgment in favor of defendants.

### C.     Fourteenth Amendment Claim

Young asserts that was denied equal protection of the law because he was not treated similarly to other Custody Level 3-4 inmates. (Doc. 1 ¶¶ 49, 51). The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. U.S. CONST., amend. XIV; City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (citing Plyer v. Doe, 457 U.S. 202, 216 (1982)). An equal protection claim can be brought by a "class of one," a plaintiff alleging that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003); see also Jean-Pierre v. Bureau of Prisons, 497 F. App'x 164, 168 (3d Cir. 2012). If a distinction between persons does not implicate a suspect or quasi-suspect class, state action will be upheld if it is rationally related to a legitimate state interest. See Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 423 (3d Cir. 2000). Proof of

disparate impact alone, however, is not sufficient to succeed on an equal protection

claim; a plaintiff also must prove that the defendant intended to discriminate.  See

Vill. of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-66 (1977);

Washington v. Davis, 426 U.S. 229, 242, 244-45 (1976).  Thus, discriminatory intent

must be a motivating factor in the decision, even though it need not be the sole

motivating factor.  See Vill. of Arlington Heights, 429 U.S. at 265-66.  Moreover, to

prove a lack of rational basis, a plaintiff must negate every conceivable rational

basis for his differential treatment.  See Bd. of Trustees v. Garrett, 531 U.S. 356, 367

(2001); Ramsgate Court Townhome Ass'n v. West Chester Borough, 313 F.3d 157,

160 (3d Cir. 2002).

Young claims that because he was classified as a Custody Level 3-4 inmate in

general population at the State Correctional Institution, Albion, Pennsylvania

("SCI-Albion"), he had a reasonable expectation to be treated similarly as other

Custody Level 3-4 inmates in general population at SCI-Benner, and also had a

reasonable expectation to be treated the same as all other state prisoners.  (Doc. 27,

at 5; Doc. 46, at 13-15).  However, defendants argue that Young is more similarly

situated to other inmates who were temporary transfers sent to SCI-Benner, and

not to inmates permanently housed at SCI-Benner.  (Doc. 34, at 16-17).  The court

agrees.

The undisputed evidence demonstrates that other inmates temporarily

transferred to SCI-Benner for court were also sent directly to the RHU.  (Doc. 34-1,

Young Dep. at 33:1-34:14 and 35:2-7).  Young has failed to present any evidence

from which it can be concluded that he was treated differently than similarly situated persons. The court finds that Young has failed to meet the threshold requirement of an equal protection claim because he did not allege differential treatment between himself and other inmates temporarily transferred to SCI-Benner for court proceedings. Defendants are entitled to an entry of judgment in their favor on the equal protection claim.

To the extent that Young asserts that his placement in the RHU violates due process, this claim is without merit. The Fourteenth Amendment prohibits the states from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. "Due process protection for a state created liberty interest is . . . limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" Griffin, 112 F.3d at 706 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)). "[C]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (quoting Sandin, 515 U.S. at 486). Young's placement in the RHU for a total of sixty-three days over the course of three temporary transfers does not establish an atypical or significant hardship sufficient to trigger due process protection. See Griffin, 112 F.3d at 708 (holding that "exposure to the conditions of administrative custody for periods as long as 15 months falls within the expected parameters of the sentence imposed [. . .] by a court of law" and does

19

not constitute a due process violation (quotation omitted)); see also Williams v. Armstrong, 566 F. App'x 106, 108 (3d Cir. 2014) (per curiam) (prisoner failed to allege liberty interest based on four-month placement in the RHU).  Accordingly, Young's due process claim with regard to his placement in the RHU fails, and defendants are entitled to summary judgment on this claim.

## IV. <u>Conclusion</u>

For the reasons set forth above, the court will grant defendants' motion (Doc. 33) and enter summary judgment in their favor.  The court will deny plaintiff's motion (Doc. 26).  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        March 30, 2020